## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BOB CAJUNE; CYNTHIA CAJUNE; KALYNN KAY AAKER; LION 194; JOHN DOE #1; MARY ROE # 1-7; S.W., C.W., O.W., and H.W., minors, by KALYNN KAY AAKER. <br><br> Plaintiffs, <br><br> v. <br><br> INDEPENDENT SCHOOL DISTRICT 194 and DOUG VAN ZYL, or any successor, in his official capacity as Superintendent of Independent School District 194, <br><br> Defendants. | Court File No. _____ <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **JURY TRIAL DEMANDED** |

For their complaint against Defendants, Plaintiffs allege as follows:

### INTRODUCTION

1.      In April 2021, Defendant Lakeville Area Schools, Independent School District 194 ("ISD 194" or the "District") paid for and allowed to be posted a race-based "Inclusive Poster Series" which included two posters with the political slogan, "Black Lives Matter." The two posters also state: "At Lakeville Area Schools we believe Black Lives Matter and stand with the social justice movement this statement represents. This poster is aligned to School Board policy and an unwavering commitment to our Black students, staff and community members." (emphasis added).

1

2.      The District did not independently craft or control the messaging on the posters, which represent the private expression of certain members of the Lakeville community to the exclusion of other views. Instead, ISD 194 simply slapped a government stamp of approval on this private expression.

3.      When other ISD 194 taxpayers, such as Bob Cajune, asked that alternative ideological viewpoints be presented alongside the Black Lives Matter posters, such as "All Lives Matter" or "Blue Lives Matter," ISD 194 refused to allow these rival viewpoints, stating "[ISD 194] does not approve of All Lives Matter or Blue Lives Matter posters in the classrooms or other areas of the school, and teachers/school staff are not allowed to wear shirts with these sayings to school;" and "the All Lives Matter and Blue Lives Matter mottos were created specifically in opposition to Black Lives Matter" and that those messages "effectively discount the struggle the Black students have faced in our school buildings and that Black individuals face in our society as a whole."

4.      ISD 194 stated to Plaintiff Bob Cajune that "the inclusive posters were requested by many staff and families in our school communities and was a project included within the district's inclusion work this school year," and was "fully supported by our Board of Education."

5.      ISD 194 approved of and allowed the private expression of District taxpayers, students, and staff who support the political ideology of the "Black Lives Matter" movement and organization by authorizing the posting of this slogan in ISD 194's hallways. At the same time, ISD 194 suppressed divergent viewpoints, such as Plaintiffs'.

6.      The link between the phrase, "Black Lives Matter" and the political movement are inextricably intertwined in the minds of the public. Small children understand this. N.W., a ten-year-old former student of ISD 194, stated in ISD 194's June 8, 2021 board meeting: "We all know changing the font or the color of posters does not change the meaning. I am 9 years old, and I know that. You expect me to believe that you did not know what you were doing by making these posters? Come on, people."[1]

7.      N.W. also stated at that Board meeting that "I do not judge people by the color of their skin, I don't really care what color their hair, skin, or eyes is. I judge by the way they treat me… I do not care or look at the color of skin, *but you make me think of it*. I have Asian, Mexican, white, Chinese, black friends and I don't care. I like them because some of them make me laugh, some are sweet and kind, sporty, or share the love of God. They are just my friends. You have lied to me, and I am very disappointed in all of you." (emphasis added).

8.      The District's actions in allowing the domination of the Black Lives Matter political viewpoint over other forms of political expression have created a hostile educational environment in Lakeville schools that is so invidious that it forced N.W., the ten-year-old former student, to leave ISD 194.

9.      N.W. left the District the day before the 2021-2022 school year started because of the racially hostile environment she faced at her former school. In an October 12, 2021 School Board Meeting, N.W. told the ISD 194 School Board during public

---

[1] https://www.washingtonexaminer.com/news/viral-video-minnesota-black-lives-matter-posters-schools.

comment that she left the day before school started because the District "forced her to choose" because, in part, "BLM posters are still in my school" and because the District is teaching concepts related to Critical Race Theory. N.W. stated that "school is no longer about education; school is about control and pushing agendas....I hope to come back to middle school, but I will not come back to be tormented and lied to, over and over."

10.     ISD 194's viewpoint discrimination has been confirmed by its collaboration with certain individuals from ISD 194 and outside the District on an event for fall 2021 called "Different Places, Beautiful Faces," which ISD 194's Equity Coordinator told Cynthia Cajune was to "highlight the diversity of our community, as well as to celebrate People of Color and Indigenous people in Lakeville and its surrounding communities." But when Ms. Cajune sought to include all ethnic backgrounds in the event, those controlling the event declared that "our interests are not aligned" and signed off with, "Black Lives Matter."

11.     ISD 194 has instructed children as young as fifth grade that structural racism dominates our society and that Black Lives Matter is a political movement.

12.     Plaintiffs filed a first lawsuit over these matters on August 6, 2021. That case was dismissed without prejudice on standing grounds.

13.     After the Plaintiffs filed their first lawsuit related to ISD 194's discrimination, ISD 194 allowed Black Lives Matter activists and members of a copycat leftist group called "ROAR 194" to physically block Plaintiffs from entering school board meetings, to ensure that their favored attendees were able to take the front seats and have

greater opportunities to impact the Board and Superintendent. Only after Plaintiffs complained against these practices did they cease.

14.     ISD 194's viewpoint discrimination violates the First Amendment and creates a hostile educational environment for students like Plaintiffs S.W., C.W., O.W., and H.W. Plaintiffs seek an end to this discriminatory practice.

## PARTIES

15.     Plaintiffs Bob and Cynthia Cajune are taxpayers who at all relevant times are residents within ISD 194, own property within ISD 194, and pay taxes, including property taxes, to Defendant ISD 194.

16.     Plaintiff LION 194 (Liberty In Our Neighborhood 194) is an unincorporated association consisting of ISD 194 residents and taxpayers, including Bob and Cynthia Cajune and the John Doe and Mary Roe Plaintiffs. LION 194 is a faith-based, grassroots organization established by Lakeville parents advocating for the children in ISD 194. Its mission is to foster a school environment that focuses on unity, facts, and the ability to use critical thinking skills. LION 194 has associational standing to sue the Defendants in this matter.

17.     Plaintiff Kalynn Kay Aaker is the parent and guardian of Plaintiffs S.W., O.W., C.W., and H.W, who are minors. They reside within ISD 194. S.W., C.W., O.W., and H.W. attend school within ISD 194. Ms. Aaker owns property within ISD 194 and pays taxes, including property taxes, to ISD 194. S.W., C.W., O.W., and H.W. have "White" skin.

18.     Plaintiffs John Doe #1 and Mary Roes #1-7 reside within ISD 194. They own property within ISD 194, and pay taxes, including property taxes, to Defendant ISD 194. They seek to remain anonymous for fear of reprisal from political activists in the southern suburban Minneapolis metropolitan community. These activists, who consistently engage in hateful rhetoric against their neighbors due to political differences, are part of the "cancel culture" movement that seeks to punish any dissenting viewpoints by clamoring for economic reprisals from employers against employees. Examples of these hateful and illegal acts include the intentional interference with Bittersweet Bakery's business in Eagan, including interference with their longstanding contracts, and the termination of HomeTown Bank employee Tara McNeally based on mild criticism of the Shakopee School District's Superintendent on Facebook. Plaintiffs themselves have faced physical violence from ISD 194's willful blindness toward Black Lives Matter activists and members of "ROAR 194" physically blocking Plaintiffs from entering school board meetings and assaulting them.

19.     Defendant Independent School District 194 (ISD 194) is an independent school district authorized by and constituting a political subdivision or agency of the State of Minnesota and has at all relevant times operated the public schools in Lakeville. ISD 194 is made up of a total of 57,959 people, over 11,000 of which are minor students. There are only 20,350 households in the District. https://nces.ed.gov/Programs/Edge/ACSDashboard/2717780. Only a portion of these households pay property taxes to the District as Plaintiffs do.

6

20.     Defendant Doug Van Zyl is the superintendent of ISD 194. He, or any successor, is sued in his official capacity only.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this complaint under 28 U.S.C. §§ 1331, 2201, 1343(a)(3), 1343(a)(4), and 1367 because this case presents a substantial question of federal law arising under the United States Constitution and its state law claim forms part of the same case or controversy, specifically whether Defendants' speech and exclusionary conduct violates the United States Constitution's guarantee of free speech and Title VI of the Civil Rights Act of 1964.

22.     This Court has authority to issue a declaratory judgment and to order injunctive relief and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

23.     Venue is appropriate in this district under 28 U.S.C. § 1391(e)(1). A substantial part of the events giving rise to this claim occurred in this district, Defendants maintain one or more offices and employees in this district, a substantial part of the property subject to this action is situated in this district, and a plaintiff resides in this district.

## STATEMENT OF THE CLAIM

### The Poster Series Was Created by Private Activists in Lakeville

24.     On September 22, 2020, former Superintendent Michael Baumann issued a memo to ISD 194 educators in which he interpreted ISD 194 Policy 535 to prohibit teachers from displaying in their classrooms posters containing the phrase "Black Lives Matter."

7

25.     Defendant Independent School District 194 ("ISD 194") had long maintained that written policy forbidding its employees from engaging in "conduct that is intended to be or reasonably could be perceived as endorsing or opposing specific political issues or political candidates." ISD 194 Policy 535(IV)(A)(5). Thus, the District recognizes and admits that the reasonable perceptions of third parties is key to whether statements are political or not.

26.     During the summer of 2020, in the wake of the George Floyd murder and subsequent protests and riots, a number of teachers and other activists within ISD 194 expressed a desire to hang posters with the political slogan "Black Lives Matter" on the walls of their classrooms. On September 22, 2020, an email was sent to parents and ISD 194 community members explaining that this would violate ISD 194 Policy 535 and would therefore not be allowed.

27.     That same day, a vocal group of people at a Board meeting expressed their disdain for the email and stressed their desires to allow such posters despite the District Policy. The District Superintendent subsequently addressed the room and reiterated district policy which prohibits the display of such posters. *Available at* https://isd194letv.viebit.com/player.php?hash=OeaOHshaOfzu at 00:25:30.

28.     On October 6, 2020, at a Board of Education Work Session, Superintendent Baumann again reaffirmed that the display of Black Lives Matter posters is not permitted within the district. While he spoke, he presented a slide detailing that "Black Lives Matter posters are not permitted" in one bullet point, and "Student First Amendment rights do not

end at the school door," and "Not disrupting the educational environment" under another. *Available at* https://isd194letv.viebit.com/player.php?hash=drsNreU7bKDv at 00:11:35.

29.     Superintendent Baumann also recognized that the phrase "Black Lives Matter" has a political dimension and was therefore inappropriate for display on the walls of the school. He relayed an unmistakable message that display of the posters would directly and impermissibly violate ISD 194 Policy 535. *Id.*

30.     By December, 2020, a substantial portion of four school board meetings and "work sessions" had been devoted to race-based preferential treatment of select students within ISD 194. Nevertheless, although Superintendent Baumann discussed "policy review" as related to the idea of Black Lives Matter being posted in the school, neither the School Board nor the Superintendent discussed the design or creation of any such posters in ISD 194.

31.     Despite this contrary policy, around April 2021, ISD 194 paid for and allowed to be posted a so-called "Inclusive Poster Series" that consisted of eight distinct posters, two of which included the phrase "Black Lives Matter." These "Black Lives Matter posters also included the statement: "At Lakeville Area Schools we believe Black Lives Matter and stand with the social justice movement this statement represents. This poster is aligned to School Board policy and an unwavering commitment to our Black students, staff and community members."

32.     Upon information and belief, the District spent money on the production and dissemination of the posters after they were presented by the local activists and allowed to be posted by the District.

33.     On April 13, 2021, during the Equity Update portion of the ISD 194 Board Regular Meeting, the purpose of the Inclusive Poster Series was given as "to support staff in creating school communities where students are respected, valued and welcome."

34.     At no point during any meeting prior to March 2021 did the School Board or Superintendent Baumann authorize the creation or design of the race-based "Inclusive Poster Series." In fact, that particular topic was a point of contention. Vocal staff, board members, and members of the public urged school administrators to ignore Policy 535 which forbade the posters from being displayed in the schools.

35.     According to public reports, "The district said the poster series went through a review process with focus groups that included students, school staff, school building leaders, the School Board, community advisory groups and others."

36.     Thus, the School Board and Superintendent are not the speakers of the posters. The posters are not government speech. The posters are speech of certain political activists within ISD 194 who seek to impose their views, and their views alone on the children of the District. The District has merely slapped a government imprimatur on their speech, with virtually no creative input.

**Black Lives Matter Is a Neo-Marxist, Separatist Political Organization Which Promotes Active Racial Discrimination Against White People**

37.     The slogan, "Black Lives Matter" is well-known to be a neo-Marxist separatist slogan that identifies Black Americans as "part of the global Black family" and seeks to "disrupt the Western-prescribed nuclear family structure." https://web.archive.org/web/20200917194804/https://blacklivesmatter.com/what-we-

10

believe/ (last visited March 11, 2022). The group "Black Lives Matter at School," for example, expressly includes "antiracist" doctrine as part of its principles. https://www.blacklivesmatteratschool.com/starter-kit.html; https://www.blacklivesmatteratschool.com/publications.html. (last visited March 11, 2022) This same so-called "antiracism" can be summed up by the words of Ibram X. Kendi, the author of "How to Be an Anti-Racist":

> The only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination. The only remedy to present discrimination is future discrimination.

Kendi, Ibram. "Ibram X. Kendi defines what it means to be an antiracist," Penguin June 9, 2020, *available at* https://www.penguin.co.uk/articles/2020/june/ibram-x-kendi-definition-of-antiracist.html (last visited July 23, 2021). The phrase "Black Lives Matter" and its part in the "social justice" movement is indistinguishable from these tenets.

38.    "Black Lives Matter" expressly refers to a political organization and a political movement sprung from its ideals. The addition of the words "Global Network" or "Global Network Foundation" to this motto does not alter its underlying meaning, nor does the shorthand "BLM" detract from its clear nature and activities as a political organization with a corresponding political movement.

39.    The Indiana Attorney General agrees that "Black Lives Matter is a political organization." https://www.in.gov/attorneygeneral/files/Official-Opinion-2021-2.pdf. The Indiana Attorney General further noted that the actions of the Black Lives Matter Global Network and others have made it clearer in recent months (since a July 2021 federal

memorandum on a somewhat-related issue) that Black Lives Matter is, in fact, a political organization:

> In October 2020, BLM formed a political action committee ("PAC"), citing its inaugural list of political candidate endorsements and noting its success in raising funds to "actively engage" in the 2020 election. Its 2020 Impact Report notes the PAC's endorsement of several Democratic Party candidates, and includes references to voting for the Democratic Party and Joe Biden. Moreover, a former Executive Director and co-founder of BLM is also a co-founder of the BLM PAC, making it further difficult to argue the two are separate and distinct. The creation of the BLM PAC and the relationship of the co-founder within both organizations raises the question of whether the BLM can now be considered "political," or, as the OSC has already framed – whether the BLM is an organization engaged in "partisan political activity." Given the additional activities, post-July 14, 2020, that now put BLM squarely in the classification of a political organization, any reliance on the OSC guidance memo by schools (or the Indiana Department of Education ("IDOE"), to the extent it had relied on the memo in the past) is no longer valid.

*Id.*

40.    As it pertains to posting "Black Lives Matter" or "BLM" in schools specifically, the Indiana Attorney General weighed in on this, too:

> School corporations should be mindful to adopt neutral policies regarding the display of signs and other materials that are applied in a uniform and consistent manner to not favor any political group or organization. They must ensure if they permit signs, displays, and other expressive materials or speech promoting one political organization, such as BLM, they must allow the same for all political and similar organizations. Likewise, if the school organization prohibits one political or similar organization from displaying signs or other expressive materials or speech, it must prohibit all political and similar organizations from displays, promotions, and exhibitions in its schools and on its premises, including BLM and other similar organizations.

*Id.*

41.    The Black Lives Matter Global Network Foundation is a political organization, and "Black Lives Matter" is its political mantra. It has a fundraising arm,

grassroots branches, and has created a Political Action Committee that has endorsed candidates for Congress and other partisan offices. https://www.fec.gov/data/committee/C00760686. *See* BLM 2020 Impact Report, p. 25, *available at*: https://blacklivesmatter.com/2020-impact-report/. The Black Lives Matter Global Network Foundation has also created a list of demands. *See* https://blacklivesmatter.com/blm-demands/. Some of those demands include "Convict and Ban Trump from future political office," and "Expel Republican members of Congress who attempted to overturn the election and incited a white supremacist attack." *Id.*

42.     The notion that Black Lives Matter is a political entity and is part of a political movement is not controversial. According to its website, it "continue(s) to honor our founding principles of grassroots organizing through BLM grassroots, which has chapters across the country and world. Our evolution of political courage became BLM PAC, a political power we now have in our toolbox to elect officials who create Black-affirming policies." *Available at* https://blacklivesmatter.com/8-years-strong/.

43.     Further, recent scholarly research demonstrates that the imposition of the Black Lives Matter political agenda on communities "dramatically amplify[ies] the use of terms associated with the BLM agenda throughout the movement's history." Dunivin, et al., PNAS, "Black Lives Matter protests shift public discourse," at 1, available at https://www.pnas.org/doi/pdf/10.1073/pnas.2117320119 (last accessed March 11, 2022). This change in terminology includes the imposition of "antiracist" and "critical race theory" terminology wherever the Black Lives Matter mantra is prominent, including in school curricula. Indeed,

By establishing a link between BLM's political rallies and increased use of antiracist terminology, we show how political movements change society beyond the political sphere. Scholars have shown that protest has nonpolitical impacts such as changing school curricula (18), encouraging "ethical consumerism" (19, 20), and suppressing the stock prices of firms that employ unethical labor practices (21). Similarly, BLM aims to change American society by encouraging people to use terms such as "systemic racism," "White supremacy," and "mass incarceration," which are drawn from antiracist theory. This theory argues that social institutions, such as the criminal justice system, reproduce inequality by penalizing social behaviors associated with minority groups and creating differences that encourage society at large to see racial disparities as natural and inevitable (22, 23). Antiracism discourse is distinctive in that it does not view racism as an individual pathology or dysfunction.

44.    In other words, "antiracism discourse" like that exemplified by Black Lives Matter removes focus on the "content of character" of *individuals*, and instead assigns blame to "oppressors" and demeans the "oppressed" using a broad, racial brush. And the allowance of Black Lives Matter political speech in the classrooms and hallways of ISD 194 creates a destructive positive feedback loop: "BLM affects American culture by using protests to focus attention first on individual victims and then draw attention to larger policy issues . . . it is a mistake to characterize BLM as fundamentally, or exclusively, concerned with policing or even the carceral state. Positions taken by BLM organizers and rhetoricians in publications, interviews, and speeches make clear that policing is only one facet of Black emancipatory politics under the banner of BLM." *Id.* at 9, 10.

### Lakeville Area Schools Rejects Plaintiffs' Demand for Equal Treatment of Political Speech

45.    On April 26, 2021, Plaintiff Bob Cajune sent an email to Lydia Lindsoe, Equity Coordinator for ISD 194, inquiring about the Inclusive Poster Series program and

14

whether posters displaying "All Lives Matter" and "Blue Lives Matter" could be displayed

by students and/or teachers in School District 194 schools.

46.     That same day, on April 26, 2021, Lydia Lindsoe replied in email, stating,

pertinently:

   a.   "[ISD 194] does not approve of All Lives Matter or Blue Lives Matter
        posters in the classrooms or other areas of the school, and teachers/school
        staff are not allowed to wear shirts with these sayings to school;"

   b.   the "purpose of the inclusive poster series is to create unity and ensure a sense
        of belonging for every student by affirming a wide variety of student
        identities;"

   c.   "the inclusive posters **were requested by many staff and families in our
        school communities** and was a project included within the district's inclusion
        work this school year," and was "fully supported by our Board of Education"
        (emphasis added);

   d.   "the All Lives Matter and Blue Lives Matter mottos were created
        specifically in opposition to Black Lives Matter" and that those messages
        "effectively discount the struggle the Black students have faced in our school
        buildings and that Black individuals face in our society as a whole;"

   e.   "the history of Black people in America is singular and needs to be
        acknowledged;"

   f.   "it is important that we specifically affirm Black students in our schools;"
        and

   g.   because "Black people experience ["violence, racism, and oppression"] at
        the highest rate" and "[n]o other group was ever categorized as property or
        chattel, and the historical consequences of that experience are real and
        continue to be felt today," ISD 194 "does not approve All Lives Matter
        posters or Blue Lives Matter posters in classrooms."

47.     ISD 194 thus refused to provide equal treatment to the political statements

"Black Lives Matter," "All Lives Matter," and "Blue Lives Matter" on posters within its

hallways and classrooms. Only the favored private expression, "Black Lives Matter," is

allowed. Further, Defendants' argument to Plaintiff Cajune for excluding the phrases "All

Lives Matter" and "Blue Lives Matter" acknowledges that Defendants understand that the phrase "Black Lives Matter" is associated with the private political organization and movement of the same name, and, moreover, acknowledges that they intend that association to be understood by their use of the phrase.

48.     Based on ISD 194's statement on the Black Lives Matter posters themselves (quoted herein), and Defendants' response to Plaintiff Cajune, Defendants' payment for and allowance of these posters is intended to give Black Lives Matter activists within ISD 194 (and beyond it) a monopoly on speech that promotes the political organization Black Lives Matter and its position in the "social justice movement." To a reasonable member of the public, this means that ISD 194 supports the viewpoint of Black Lives Matter and its Marxist and Black separatist, supremacist, and racist ideology that is hostile to White people as well as demeaning to Black people.

49.     Again, ten-year-olds within ISD 194 understand this. Former student N.W. told the School Board that its imposition of the Black Lives Matter posters in Lakeville schools makes her think of the political movement and its judgment of people based on the color of skin. She left the District the day before the 2021-2022 school year started because of the racially hostile environment she faced at her former school. In an October 12, 2021 School Board Meeting, N.W. told the ISD 194 School Board during public comment that she left the day before school started because the District "forced her to choose" because, in part, "BLM posters are still in my school" and because the District is teaching concepts related to Critical Race Theory. N.W. stated that "school is no longer about education;

school is about control and pushing agendas….I hope to come back to middle school, but I will not come back to be tormented and lied to, over and over."

50.     In addition, because the posters "were requested by many staff and families in our school communities," they are favored private speech of certain members of the ISD 194 community. Upon information and belief, the District exercised minimal editorial control over the posters, did not come up with the posters, and simply allowed the posters in Lakeville Schools and paid for their production and dissemination. Upon information and belief, private activists within the Lakeville community had editorial control over the creation of the posters. The District does not convey its own message through the posters; it allows the conveyance of private political speech by activists who support the Black Lives Matter political agenda.

### The District's Other Racially Biased Actions

51.     The District's other actions indicate its knowledge and favoritism of the racially biased goals of the Black Lives Matter political organization and ISD 194's commitment to viewpoint discrimination.

52.     Superintendent Michael Baumann's memo of September 22, 2020, acknowledges that the display of the phrase "Black Lives Matter" carries political significance in violation of ISD 194 Policy 535's prohibition on "conduct that is intended to be or that reasonably could be perceived as endorsing or opposing specific political issues or political candidates." ISD 194 Policy 535(IV)(A)(5).

53.     In addition, when Plaintiff Cynthia Cajune proposed that all cultures, such as Japanese, Norwegian, Dutch, Irish, and so on be represented in an event in which ISD 194

is participating, ISD 194's equity coordinator at first stated, "I like where you are going" and then connected her with those leading the planning for the event.

54.     But when Ms. Cajune asked those to whom ISD 194 referred her about being part of the planning committee for the event, the response was cold:

> Let me be explicitly clear about the goal and objective of this committee and event: Our committee is focused on centering equity and bringing awareness to the beautiful diversity from the BIPOC community that is becoming Lakeville. Fortunately for European heritage and culture, it is represented and overly represented 365 days a year and has been for centuries. This is not the space for that. This event will only focus on the Cultures and Communities of Color that are underrepresented, specifically the BIPOC community….
>
> Finally, let me also be explicitly clear: our interests are not aligned. So while there is no place for you or your husband on this committee, you are welcome to attend the event in October and be enlightened….

The writer of this email signed off with the tag line, "Black Lives Matter."

55.     After Ms. Cajune followed up with ISD 194 seeking to know to what extent ISD 194 is "collaborating" with this racially biased event and apparently ISD-194-supported event, ISD 194 went silent and failed to respond to her request for clarification.

56.     ISD 194 has also announced that it is adopting "Affinity Groups" for students—or, in other words, racial segregation. https://www.isd194.org/site/default.aspx?PageType=3&DomainID=4&ModuleInstanceID=4469&ViewID=6446EE8 8-D30C-497E-9316-3F8874B3E108&RenderLoc=0&FlexDataID=3829&PageID=1. These "Affinity Groups" are like the race-segregated employment training hosted by the City of Seattle recently, which EEOC Commissioner Peter Kirsanow noted:

> are places where "Black, non-Black people of color and Indigenous people" are all grouped together . . . as victims of white supremacy – i.e., white people

18

are presumptively bad/entitled, and non-white people of all races are their victims. Again, how can this not encourage non-white employees to be biased against and perhaps even racially harass white employees under the guise of "challenging your relationship to race and racism"?

Available at: http://www.newamericancivilrightsproject.org/wp-content/uploads/2020/08/

Letter-to-Seattle-Mayor-Durkan-8.31.2020.pdf (last visited Mar. 11, 2022).

57.     And as discussed earlier, the school board meetings held during the Fall of

2020 and Spring of 2021 were devoted largely to race-based preferential "equity" programs

and their implementation.  Many comments during these meetings to demonstrate a pattern

of racial segregation and preference within ISD 194, including:

    a.  Superintendent Baumann expressed his desire to expand hiring practices based on skin color. October 6, 2020 ISD 194 Board of Education Work Session, at 00:30:45, *available at* https://isd194letv.viebit.com/player.php?hash=drsNreU7bKDv (last visited February 23, 2022).

    b.  The stated "central purpose of the program" is to "affirm and support" certain ethnicities while refusing to take the same step for others. October 13, 2020 ISD 194 Regular School Board Meeting, at 2:09:40, *available at* https://isd194letv.viebit.com/player.php?hash=G8FTFxRoB06Q# (last visited February 23, 2022).

    c.  The Poster Series is expressly intended to "give Black people a specific place of honor," and not others. March 17, 2021 ISD 194 Board of Education Work Session at 1:53:12, *available at* https://isd194letv.viebit.com/player.php?hash=cnRL9UBOdneP (last visited February 23, 2022). This notion of preferential treatment for some students based on race has also been expressed, variously, as an "unwavering commitment," an "acknowledgment," "centering equity," and "bringing awareness" by exclusively focusing on skin color.

    d.  One particularly offensive exchange took place at the March 17, 2021 meeting, where a school board member told the group that he "had a brown kid… and it always seems like the brown kids are left out of the black lives matter stuff."  He then asked to have just one poster changed so as not to exclude his child, whose skin was not the preferred color.  His request was quickly denied.  ISD 194 was plainly aware that its new "inclusive" posters

served to reward and recognize chosen students based on skin color at the expense of others, and based on the specific demands of only certain Lakeville activists. March 17, 2021 ISD 194 Board of Education Work Session at 01:51:05, *available at* https://isd194letv.viebit.com/player.php?hash=cnRL9UBOdneP (last visited February 23, 2022).

58.     As just one other example, ISD 194 has shown to fifth-grade students at Eastview Elementary a video from the "BrainPOP" collection that states that "structural racism" in America "makes life easier for White people and more difficult for Black people and People of Color." That same video told these fifth graders that "Black Lives Matter grew into a movement" and praised the City of Minneapolis' 2020 resolution to dismantle the Minneapolis Police Department. https://www.youtube.com/watch?v=xv3dAJUTCT0.

### Refusing to Display Diverging Viewpoints on Race Relations in Public Fora Is Viewpoint Discrimination

59.     By displaying the two posters bearing the organizational slogan for Black Lives Matter, ISD 194 *de facto* violated its own written policy against engaging in "conduct that is intended to be or that reasonably could be perceived as endorsing or opposing specific political issues or political candidates." ISD 194 Policy 535(IV)(A)(5).

60.     This *de facto* new policy informed the District and Superintendent's decisions, and it authorizes consistent behavior from teachers and other staff, who have been posting and are posting Black Lives Matter posters in the hallways and classrooms of ISD 194.

61.     Upon information and belief and based on ISD 194's written policy against political speech in schools, ISD 194 does not have a history of opening the District's hallways and classrooms for political messaging by private citizens, and it does not have a

history of allowing the posting of private political messaging via posters such as the ones at issue in this case. ISD 194's hallways and classrooms, where the Poster Series is displayed, are therefore a designated public forum.

62.     Private parties, and not government entities, exercised extensive editorial control over the posters.  This includes their design, fine-tuning the races and genders of the characters in the posters, and how many posters were to be hung in which places.  Non-government entities also determined how the posters were to be hung, including whether they would be framed or not.

63.     The only notable exception to this complete control by private groups was a discussion by the School Board to change a blonde girl holding a rainbow flag, saying "be proud of who you are," into a blonde boy, which was agreed to before the Poster Series hit ISD 194 classrooms and hallways.

64.     There is no evidence that the ISD 194 School Board exercised any real editorial control in the creation of the posters.  As treated earlier, School Board meetings held during the Fall of 2020 through Spring of 2021 reiterated the prohibition against such political messaging in Policy 535.

65.     These posters were revised by private individuals part of committees and focus groups chosen by the District. The private parties were chosen specifically because they were not representatives of the District and could provide input as private citizens in crafting the message within the posters. *See* April 27 ISD 194 Regular School Board Meeting at 00:31:40-00:32:10, *available at* https://isd194letv.viebit.com/player.php?hash=5XPZCbrakrgG# (last visited February 22, 2022).

66.     ISD 194 does not exercise direct control over the placement of the posters within the District.  Rather, the new policy allows for teachers and employees to select which posters to display, and where.  Thus, the decision on whether to "speak" through the posters in support of the "Black Lives Matter" political message is left to individuals who subscribe to this chosen ideological viewpoint.

67.     The Poster Series was specifically designed to facilitate private speech and was intended to be made available to teachers or principals to order from a catalog. School officials also discussed T-shirts and display by other means.  Just as the school district said, these posters are to satisfy and enable teachers to engage in private speech. They are not to announce a message from ISD 194. They are products of a limited number of students, parents, and teachers of ISD 194, whose political views aligned with a chosen viewpoint.

68.     By allowing the display of the "Black Lives Matter" posters on school property, Defendants have made that property a designated public forum and must abide by "the same standards as apply in a traditional public forum," *Perry Educ. Ass'n*, 460 U.S. at 46, "ensuring equality of treatment toward all candidate[s] and issues." *E.g.,* ISD 194 Policy 535(IV)(C)(2).

69.     By refusing to allow Plaintiffs to display the phrases "All Lives Matter" and "Blue Lives Matter" in classrooms, Defendants intentionally discriminated against those viewpoints in violation of the First Amendment.

70.     Moreover, Defendants' allowing the display of the "Black Lives Matter" posters has the effect of inciting a racially hostile school environment in violation of Title VI of the Civil Rights Act of 1964.

22

71.   This racially hostile environment created by Defendants is harassing to S.W., C.W., O.W., and H.W. and students like them because it promotes racism and racial inequality, instead of unity and equality. The racially hostile environment created by Defendants leads N.W. and students like her to think of race as a dividing concept, and has forced N.W. to leave the District.

72.   To that point, Plaintiffs S.W., C.W., O.W., and H.W. have experienced a hostile educational environment, because they have White skin, as a result of the District's actions in the following ways:

a.   C.W. relies on special transportation to get home from school and found himself being forgotten on several occasions. When she asked why C.W. was being left at school despite the bus route being well-known, Kalynn Aaker was told by C.W.'s bus driver that he wanted to drive C.W. home but was denied the opportunity to do so. When she inquired further, she was told that the bus company determines the routes and that black students are prioritized over white students if there is a shortage of available drivers.

b.   H.W. and O.W. transferred to another school within the District to escape the racially hostile environment they experienced at the first school.

c.   After seeing the "Black Lives Matter" posters on display at her school, O.W. asked her teacher what color her own skin was.  When she was told she was white, O.W. asked "Then does my life not matter?"  O.W. was in the first grade.

d.   On separate occasions, O.W. has also asked whether this means that *only* black lives matter.

e.   O.W. has also asked whether "orange lives matter," in reference to former President Donald Trump.

f.   Both H.W. and O.W. remember the violence of 2020, particularly when groups and individuals bearing "Black Lives Matter" clothing and insignia ransacked and burned buildings in Minnesota. They associate "Black Lives Matter" with fear and hate and they are questioning why a message like this is being reinforced by selected teachers and school staff.

g.   Neither H.W. and O.W. believe that the posters' "Black Lives Matter" messaging reflects anything other than racial division and hostility.

73.     These experiences in ISD 194, including the Poster Series discrimination, demonstrate that ISD 194's racial discrimination against Plaintiffs is based on their race, namely that they are not Black.

74.     These experiences, including the experiences with the Poster Series that forced N.W. to leave the District, have had a substantial adverse impact on these students' education because they distract from ISD 194's pedagogical purpose of teaching students. Instead, indoctrinate them into mindsets of racial discrimination which consider the color of skin over the content of character.

**The School Board and the Superintendent's Authority**

75.     Pursuant to Lakeville Policy 302(III)(A), the Superintendent has "charge of the administration of the schools under the direction of the Board of Education."

76.     Pursuant to Minn. Stat. § 123B.02, the Board "must have the general charge of the business of the district, the school houses, and of the interests of the schools thereof."

77.     Because of their responsibilities under law and District policy, the Superintendent and the Board are capable of providing the relief sought in this Complaint, whether by requiring the removal of all Black Lives Matter posters in the District or allowing the posting of diverging viewpoints, such as All Lives Matter or Blue Lives Matter posters.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. §§ 1983, 1988; FIRST AMENDMENT VIOLATION

78.      Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

79.      "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of U. of Virginia*, 515 U.S. 819, 828 (1995). When the government discriminates in this way, such discrimination "is presumed to be unconstitutional." *Id*.

80.      When the government engages in viewpoint discrimination, it "targets not subject matter, but particular views taken by speakers on a subject." *Id.* at 829. Thus, the government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.; s*ee *Perry Ed. Assn.,* 460 U.S. at 46.

81.      "[T]he test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring in part).

82.      Defendants designated ISD 194 school property as *de facto* designated public forum when they allowed the display on ISD 194 school property signs bearing the organizational slogan "Black Lives Matter."

83.     Defendants then discriminated against Plaintiffs' viewpoint when they prohibited anyone from displaying on ISD 194 school property posters with the phrases "All Lives Matter" and "Blue Lives Matter" because those posters constitute the same "subject matter" as "Black Lives Matter." *Id*.

84.     The Poster Series is not government speech because ISD 194 is not speaking for itself, but rather is regulating private expression. *Shurtleff v. City of Boston*, No. 20-1800, 2022 U.S. LEXIS 2327, at *14-15 (May 2, 2022).

85.     Defendants violated Plaintiffs' First Amendment Free Speech rights when Defendants excluded, and thereby discriminated against, Plaintiffs' viewpoint that Plaintiffs wanted displayed alongside Defendants' "Black Lives Matter" posters.

**COUNT II**
**VIOLATION OF TITLE VI (HOSTILE EDUCATIONAL ENVIRONMENT)**

86.     Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth herein.

87.     Upon information and belief, ISD 194 receives federal funding and is subject to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*

88.     Defendants have subjected students at ISD 194 to severe, pervasive, and objectively offensive racial harassment by displaying inherently racially discriminatory posters bearing the organizational slogan "Black Lives Matter," a private political organization advocating a Marxist and Black separatist, supremacist, and racist ideology that is hostile to White people as well as demeaning to Black people.

89.     N.W. publicly stated the impact of these posters—that they caused her to think of distinctions between people based on the color of their skin, instead of the content of their character. N.W. also publicly stated that these posters invoke "getting rid of police officers, rioting, burning buildings down." The District's racially discriminatory actions to those with White skin, like N.W., forced her to leave the District.

90.     As alleged above in paragraphs 71 and 72, Plaintiffs S.W., C.W., O.W., and H.W. have experienced a hostile educational environment, because they have White skin, as a result of the District's actions.

91.     A reasonable person in the Lakeville School District would find that the District's allowance of the Poster Series to the exclusion of other posters which would celebrate and affirm the value of all races, and the other racist actions alleged herein, target students like the Plaintiffs for harassment because they have White skin.

92.     The Plaintiffs themselves perceive the District's actions to be abusive and directed at them because of their race.

93.     The harassment has a systemic effect on education within the District as a whole.

94.     Defendants have control over the source of harassment and the environment in which the harassment occurs.

95.     Defendants know of the harassment and are not only deliberately indifferent to it, they encourage it.

96.     Defendants' deliberate indifference to the ongoing racially hostile environment violates Title VI of the Civil Rights Act.

27

**RELIEF REQUESTED**

Plaintiffs respectfully request that this Court:

A.     Enter and order allowing John Doe #1 and Mary Roes #1-7 to proceed pseudonymously;

B.     Enter a declaratory judgment that Defendants' refusal to allow Plaintiffs to display posters on ISD 194 school property, stating "All Lives Matter" or "Blue Lives Matter," while "Black Lives Matter" posters are allowed, violates their First Amendment Free Speech rights promised in the United States Constitution;

C.     Enter a declaratory judgment that Defendants' display of the "Black Lives Matter" posters and other actions alleged herein violate Title VI of the Civil Rights Act by creating a hostile educational environment;

D.     Enter an order preliminarily and permanently enjoining Defendants from displaying the "Black Lives Matter" organizational slogan posters, or in the alternative allowing Plaintiffs' viewpoint, including "All Lives Matter" and "Blue Lives Matter," equal space within ISD 194;

E.     Award attorney fees in favor of Plaintiffs and against Defendants upon Plaintiffs prevailing in this litigation and after an appropriate motion, pursuant to 42 U.S.C. § 1988;

F.     Award costs in favor of Plaintiffs and against Defendants upon Plaintiffs prevailing in this litigation and after filing of a notice of taxation of costs and disbursements;

G.     Grant Plaintiffs such other and further relief as the court deems appropriate.

**UPPER MIDWEST LAW CENTER**

Dated:  August 31, 2022                       /s/ James V. F. Dickey
                                              Douglas P. Seaton (#127759)
                                              James V. F. Dickey (#393613)
                                              8421 Wayzata Blvd., Suite 300
                                              Golden Valley, Minnesota 55426
                                              Doug.Seaton@umlc.org
                                              James.Dickey@umlc.org
                                              (612) 428-7000

                                              *Attorneys for Plaintiffs*