UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Bob Cajune, Cynthia Cajune, Kalynn Kay Aaker, LION 194, John Doe #1, Mary Roe #1–7, and S.W., C.W., O.W., and H.W., *minors*, *by Kalynn Kay Aaker*,<br><br>Plaintiffs,<br><br>v.<br><br>Independent School District 194, and Doug Van Zyl, *or any successor, in his official capacity as Superintendent of Independent School District 194*,<br><br>Defendants. | Civ. No. 22-2135 (JWB/ECW)<br><br>**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION TO PROCEED PSUEDONYMOUSLY AND GRANTING DEFENDANTS' MOTION TO DISMISS** |

---

James V.F. Dickey, Esq., and Douglas P. Seaton, Esq., Upper Midwest Law Center, counsel for Plaintiffs.

Trevor S. Helmers, Esq., and Zachary J. Cronen, Esq., Rupp, Anderson, Squires & Waldspurger, counsel for Defendants.

---

Since the summer following *Brown v. Board of Education*, 347 U.S. 483 (1954), public schools have played a central role in preparing our children to live harmoniously in an increasingly multicultural and diverse country through an integrated educational environment. The Supreme Court has "also acknowledged that public schools are vitally important in the preparation of individuals for participation as citizens, and as vehicles for inculcating fundamental values necessary to the maintenance of a democratic political system." *Bd. of Educ. v. Pico*, 457 U.S. 853, 864 (1982) (quotation omitted).

Following George Floyd's murder in May 2020, school administrators, staff, and

teachers joined much of the country in finding ways to support their students, including Black students. For its part in those efforts, in April 2021, the school board for the Lakeville, Minnesota public school district vetted and authorized a multicultural poster series that included two posters with the phrase "Black Lives Matter."

Not everyone supported the decision. Believing the posters carried political messages, some parents and students objected to hanging "Black Lives Matter" posters without also displaying posters offering various other viewpoints. After the school board denied those requests, the objectors challenged the school board's action by filing this lawsuit, claiming First Amendment violations. (*See* Doc. No. 17 ("Am. Compl.").)

The school board now seeks to dismiss the case. (Doc. No. 23.) The central issue is whether displaying the "Black Lives Matter" posters violated Plaintiffs' constitutional rights by endorsing what they contend is a hostile political ideology.

Because display of the posters constitutes government speech not subject to First Amendment challenge, the school board's motion is granted, and Plaintiffs' lawsuit is dismissed with prejudice.

## BACKGROUND

### I.     The Parties

Defendants are the Independent School District 194 in Lakeville, Minnesota ("ISD 194" or "the District") and its superintendent, Doug Van Zyl. (Am. Compl. ¶¶ 22, 23.)

Named Plaintiffs include Bob and Cynthia Cajune, "who at all relevant times are residents within ISD 194, own property within ISD 194, and pay taxes, including property taxes, to Defendant ISD 194." (*Id.* ¶ 18.) Another is Kalynn Kay Aaker, who

pays taxes to the District and sues as the parent and guardian of minor-plaintiffs S.W., O.W., C.W., and H.W., school children from the District alleged in the Complaint to "have 'White' skin." (*Id.* ¶ 20.) Finally, Plaintiff LION 194 is an unincorporated "faith-based, grassroots" association of District residents and taxpayers. (*Id.* ¶ 19.)

The remaining Plaintiffs are John Doe #1 and Mary Roes #1–7 ("the Unnamed Plaintiffs"), who allege that they pay taxes to the District and "seek to remain anonymous for fear of reprisal from political activists in the southern suburban Minneapolis metropolitan community." (*Id.* ¶ 21.)

## II.     The Inclusive Poster Series

Following George Floyd's murder in 2020, "teachers, staff, and activists" in the District requested permission to display "Black Lives Matter" posters in hallways and classrooms. (*Id.* ¶¶ 1, 29.) On September 22, 2020, the District's superintendent at the time emailed parents to explain that teachers would not be allowed to display "Black Lives Matter" posters in school because doing so would violate the District's policy against "conduct that is intended to be or reasonably could be perceived as endorsing or opposing specific political issues or political candidates." (*Id.* ¶¶ 2, 28–29.) At a school board meeting on the same day, "a vocal group of people . . . expressed their disdain for the email and stressed their desires" to display the posters. (*Id.* ¶ 30.)

By December 2020, four school board meetings and "work sessions" had been substantially devoted to discussions of race, including a "policy review" over posting "Black Lives Matter" in the District's schools. (*Id.* ¶ 33.) In April 2021, the District "authorized," "paid for," and "allowed to be posted" the "Inclusive Poster Series" (shown

below) "to support staff in creating school communities where students are respected, valued[,] and welcome." (*Id.* ¶¶ 4, 9, 34, 36.)

Two of the eight posters include the phrase "Black Lives Matter" and the following statement: "At Lakeville Area Schools we believe Black Lives Matter and stand with the social justice movement the statement represents. This poster is aligned to School Board policy and an unwavering commitment to our Black students, staff[,] and community members." (*Id.* ¶¶ 4, 34.)

  
  

4



(Doc. No. 26-1 at 1–5.)

The Inclusive Poster Series "went through a review process with focus groups that included students, school staff, school building leaders, the School Board, community advisory groups[,] and others." (Am. Compl. ¶ 38.) The District considered stakeholder feedback to further diversify the poster series. For example, they "didn't see an Asian person" in the posters, and the Native American Liaison "wanted to see . . . Native American students represented." (*Id.* ¶ 39(g).) The District also discussed replacing the blonde girl with a blonde boy in the poster with children holding signs. (*Id.* ¶ 67.) To finalize the posters, the District stated that it would "be meeting with a couple more internal district leadership committees to gain some final input, and then from there [to] just work with a printer." (*Id.* ¶ 39(h).) Then, District schools "could pick and choose" which posters they wanted. (*Id.* ¶ 39(f).)

Plaintiff Bob Cajune, a District taxpayer, asked the District to allow "rival

viewpoints" such as "All Lives Matter" or "Blue Lives Matter" to be presented alongside the "Black Lives Matter" posters. (*Id*. ¶¶ 7, 49.) The District declined, stating that those "mottos were created specifically in opposition to Black Lives Matter" and "discount the struggle the Black students have faced in our school buildings and that Black individuals face in our society as a whole." (*Id.* ¶¶ 7, 50.)

### III. The Meaning of "Black Lives Matter" According to Plaintiffs

Plaintiffs allege that "Black Lives Matter" "is well-known to be a neo-Marxist separatist slogan that identifies Black Americans as 'part of the global Black family' and seeks to 'disrupt the Western-prescribed nuclear family structure,'" which "is hostile to White people as well as demeaning to Black people." (*Id*. ¶¶ 41, 52.) Plaintiffs further allege that the group "Black Lives Matter at School . . . encourages the emphasis of 'Black Villages,'" which means "the disruption of Western nuclear family dynamics." (*Id*. ¶ 41.) To Plaintiffs, the link between the phrase "Black Lives Matter" and the political movement are "inextricably intertwined in the minds of the public." (*Id.* ¶ 10.) "Small children understand this," according to Plaintiffs.[1] (*Id*.)

### IV. The Lawsuit and Present Motions

Plaintiffs sued Defendants under the First Amendment for "exclud[ing], and thereby discriminat[ing] against Plaintiffs' viewpoint that Plaintiffs wanted displayed alongside the 'Black Lives Matter' posters" and for compelling them to "subsidize

---

[1] When asked to explain these phrases at oral argument, Plaintiffs' counsel could not provide clear answers, instead deflecting that the phrases came from the Black Lives Matter Global Network Foundation website and that the Court would need to ask members of the Black Lives Matter Global Network Foundation for their meaning.

6

unwanted political advocacy by private parties." (*See id.* ¶¶ 85, 88.) They challenge only the two posters in the Inclusive Poster Series that bear the phrase "Black Lives Matter."

Defendants move to dismiss the Amended Complaint.[2] (Doc. No. 23.) Defendants contend that Plaintiffs lack standing, and that the government speech doctrine precludes their First Amendment claims. Plaintiffs oppose dismissal and seek leave for the Unnamed Plaintiffs to proceed using pseudonyms. (Doc. Nos. 33, 35.)

## DISCUSSION

**I.    The Unnamed Plaintiffs' Motion to Proceed Pseudonymously**[3]

Federal Rule of Civil Procedure 10(a) requires that the complaint "must name all the parties." It is fundamental that "the public has a right to know who is using [its] courts." *Mitze v. Saul*, 968 F.3d 689, 692 (7th Cir. 2020) (internal quotation omitted); *see also Craig v. Harney*, 331 U.S. 367, 374 (1947) ("A trial is a public event. What transpires in the court room [sic] is public property."). Accordingly, "[t]here is a strong presumption against allowing parties to use a pseudonym." *Luckett v. Beaudet*, 21 F. Supp. 2d 1029, 1029 (D. Minn. 1998) (citations omitted).

On a motion to proceed pseudonymously, courts consider three non-exhaustive factors "which, if present, might support anonymity": (1) whether the plaintiffs seeking

---

[2]    Plaintiffs filed a near-identical complaint in this District in 2021. *See Cajune v. Indep. Sch. Dist. 194*, Civ. No. 21-1812 (ADM/BRT), 2022 WL 179517, at *6 (D. Minn. Jan. 19, 2022) (dismissing for lack of standing). The Amended Complaint in this matter differs in two notable respects: (1) the Cajunes' child is not a plaintiff, and (2) Plaintiffs specifically allege that the taxpayers pay taxes directly to the school district.

[3]    The motion will be considered only as it relates to the unnamed adult Plaintiffs. Plaintiffs known to be minors may proceed using their initials. Fed. R. Civ. P. 5.2(a)(3).

anonymity are "suing to challenge governmental activity"; (2) whether prosecuting the suit compels plaintiffs to disclose "information of the utmost intimacy"; and (3) whether plaintiffs are "compelled to admit their intention to engage in illegal conduct, thereby risking criminal prosecution." *See id.* (internal quotations omitted).

Only the first factor is arguably present here.[4] "[I]n only a very few cases challenging governmental activity can anonymity be justified." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981). "The threat of hostile public reaction to a lawsuit, standing alone, will only with great rarity warrant public anonymity." *Id.* The Unnamed Plaintiffs have not presented such a rare case.[5]

The Unnamed Plaintiffs vaguely reference "cancel culture" and two incidents that occurred outside of the District as evidence that they reasonably fear "reprisal from political activists" for participating in this case: interference with a bakery's business in Eagan, and a Shakopee bank employee who lost their job after criticizing a school district superintendent online. (*See* Am. Compl. ¶ 21.) But the two alleged incidents lack any connection to the phrase "Black Lives Matter" and bear no similarity to the Inclusive Poster Series at issue here. The Unnamed Plaintiffs also claim that Plaintiffs had been

---

[4] The other two factors simply do not apply. Cases using pseudonyms based on the "utmost intimacy" factor involve matters such as abortion or artificial insemination. *See, e.g.*, *Roe v. Wade*, 410 U.S. 113 (1973); *James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993). And the Unnamed Plaintiffs do not claim that they intend to commit or risk being criminally prosecuted for illegal conduct relating to their views.

[5] Not even the Missouri state coordinator of the notoriously anonymous Ku Klux Klan proceeded under a pseudonym in a lawsuit challenging government speech as viewpoint discrimination. *See, e.g.*, *Knights of Ku Klux Klan v. Curators of Univ. of Mo.*, 203 F.3d 1085, 1089 (8th Cir. 2000).

8

physically blocked from entering school board meetings, but the alleged misbehavior stopped after Plaintiffs complained. (*See id.* ¶¶ 16, 21.) Finally, the named Plaintiffs *in this case* have litigated two federal lawsuits asserting their viewpoints for nearly two years without apparent incident. The motion to proceed pseudonymously is denied.[6]

## II. Defendants' Motion to Dismiss

### A. Motion to Dismiss Standard

To survive a motion to dismiss, a plaintiff must provide "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face when the plaintiff pleads sufficient facts to draw "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This requires a complaint to contain enough factual allegations "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A recitation of the elements of a cause of action, supported merely by conclusory allegations, is not sufficient. *Iqbal*, 556 U.S. at 678.

In assessing a complaint's sufficiency, the reviewing court accepts well-pled allegations as true and draws all reasonable inferences in the plaintiff's favor, *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014), but is not required to accept a complaint's legal conclusions, *Iqbal*, 556 U.S. at 678.

### B. The Cajunes and Ms. Aaker Have Municipal Taxpayer Standing

As a threshold matter, Defendants argue that Plaintiffs Bob Cajune, Cindy Cajune,

---

[6] Because the case is dismissed for the reasons stated below, the Court does not address Defendants' separate argument to dismiss the Unnamed Plaintiffs because they failed to seek permission to plead pseudonymously when filing their initial complaint.

and Kalynn Kay Aaker lack standing to bring their lawsuit. Under Article III of the Constitution, federal courts only have jurisdiction to resolve cases and controversies. U.S. Const. Art. III § 2, cl. 1. That limited jurisdiction requires a party filing suit to have standing—a sufficient personal interest—to bring the litigation. *See Davis v. Federal Election Comm'n*, 554 U.S. 724, 732–33 (2008). To establish standing, whichever party invokes federal jurisdiction must demonstrate (1) an injury in fact, (2) fairly traceable to the challenged conduct, and (3) likely to be redressed by a favorable judicial decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

In general, merely being a taxpayer does not establish standing. *See Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806, 809–10 (8th Cir. 2022) (quoting *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011)). However, municipal taxpayers may have standing as a result of their "peculiar relationship" to their municipality, in which the taxpayers have a "direct and immediate interest in municipal expenditures." *Id.* at 810–11 (quoting *Frothingham v. Mellon*, 262 U.S. 447, 487 (1923); *DaimlerChrysler Corp. v. Cuno*, 547 US. 332, 349 (2006)).

To have municipal taxpayer standing, "(1) the plaintiff must actually be a taxpayer of the municipality that she wishes to sue; and (2) the plaintiff must establish that the municipality has spent tax revenues on the allegedly illegal action." *Id.* at 811 (quoting *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 734 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 2583 (2021)). At the pleading stage, this requires clear allegations demonstrating each standing element. *See id.* (quotations omitted).

The Cajunes and Ms. Aaker pass what is "merely a threshold inquiry" under

10

*Huizinga*. *See id.* They specifically allege that they "pay taxes, including property taxes, to ISD 194" and that the District "expended Plaintiffs' taxpayer dollars" on the poster series. (Am. Compl. ¶¶ 18, 20, 35, 74.) Taking those allegations as true, Mr. Cajune, Mrs. Cajune, and Ms. Aaker have standing as District taxpayers to challenge its alleged expenditures of their tax dollars.

The Court rejects Defendants' argument that Plaintiffs cannot establish an actionable municipal action because any spending on the "Black Lives Matter" posters was de minimis. (*See* Doc. No. 25 at 13–14.) Defendants cite no authority establishing a "de minimis spending" exception to municipal taxpayer standing in the Eighth Circuit. And Defendants' cited example, *ACLU-NJ v. Township of Wall*, decided standing on review of a more developed record. 246 F.3d 258, 263–64 (3d Cir. 2001) (considering complaint, answer, declarations, and affidavits to evaluate standing on summary judgment appeal). Even if Defendants' "de minimis spending" exception applied, at this preliminary stage the Court cannot conclude that the District spent only a de minimis amount on the posters based on Plaintiffs' pleading alone. Under *Huizinga*, the Cajunes and Ms. Aaker sufficiently allege municipal taxpayer standing here.[7]

---

[7] The District's summer break was also considered in assessing whether this matter remains a justiciable case or controversy, a threshold to federal jurisdiction under Article III of the Constitution. The matter remains a live controversy because it is "capable of repetition, yet evading review." *See Stevenson v. Blytheville Sch. Dist. No. 5*, 762 F.3d 765, 769–70 (8th Cir. 2014) (finding no repetition because dispute pertained to one school year that had ended). Nothing in the record indicates that the contested posters were only to be hung for the 2022–23 school year.

11

## C. The Inclusive Poster Series is Government Speech and Not Subject to First Amendment Challenges

Turning to the substance of the alleged First Amendment violations, Defendants contend that the government speech doctrine bars Plaintiffs' claims. Under the government speech doctrine, when the government speaks for itself, that speech is not subject to First Amendment challenges. *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–68 (2009). "That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) (citation omitted).

To classify speech as private or government speech, courts consider: (1) the history of the expression at issue; (2) the public's likely perception as to who is speaking; and (3) the extent to which the government actively shaped or controlled the expression. *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589–90 (2022) (citing *Walker*, 576 U.S. at 209–14). All three factors favor finding government speech here.

### 1. Schools communicate with their students using posters

On the "history of expression" factor, Defendants assert that schools traditionally control and communicate messages on their walls. Indeed, the Ninth Circuit recognized a bulletin board in a public school hallway to be "an expressive vehicle for the school board's policy." *See, e.g.*, *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1011–12 (9th Cir. 2000) (stating that posters left by faculty on bulletin board in school hallway were "equivalent to [the schools] and the school board itself speaking," as posters were placed on school property and subject to oversight by school principals).

12

Plaintiffs contend that the specific history of the Inclusive Poster Series shows that the District "laundered the Black Lives Matter activists' personal political expression under the guise of so-called 'government speech.'" (Am. Compl. ¶¶ 5, 40; *see also* Doc. No. 33 at 31.) However, District school board meeting recordings—which are directly referenced, quoted, and embraced by the Amended Complaint[8]—belie Plaintiffs' suspicions. The recordings show that the District reviewed, authorized, and provided the posters "to support staff in creating school communities where students are respected, valued, and welcome" and "to help our BIPOC students feel welcome in our classrooms." (Am. Compl. ¶¶ 36, 39.) The specific history of the Inclusive Poster Series shows it was developed as a method for the District to communicate with its students.

### 2. The public is likely to perceive the posters as the District sending a supportive message to its students

The second factor focuses on public perception of the speaker and the message. *Shurtleff*, 142 S. Ct. 1583, 1589 (considering "the public's likely perception as to who (the government or a private person) is speaking"); *Walker*, 576 U.S. at 216 (considering "observers' reasonable interpretation of the messages"). Plaintiffs argue that the phrase "Black Lives Matter" is so intertwined with private political speech that it cannot be government speech. (*See* Doc. No. 33 at 33.)

Plaintiffs acknowledge that the two "Black Lives Matter" posters include the

---

[8] "Though matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004) (quotations omitted).

13

following statement: "At Lakeville Area Schools we believe Black Lives Matter and stand with the social justice movement the statement represents. This poster is aligned to School Board policy and an unwavering commitment to our Black students, staff[,] and community members." (Am. Compl. ¶ 34.) At oral argument, Plaintiffs' counsel also acknowledged that the school board chair made the following statement at the April 27, 2021 school board meeting: "Black Lives Matter on a couple of these posters affirms and acknowledges black students and black families in our communities. . . . We are addressing the need to improve our students' academic achievements." (*Id*. ¶ 69.)

Despite Plaintiffs' awareness of the District's stated intent to communicate support to its students through the posters, Plaintiffs nonetheless allege that hanging the posters was private political speech because "[t]o a reasonable member of the public, this means that [the District] supports the viewpoint that Black Lives Matter and its Marxist and Black separatist, supremacist, and racist ideology that is hostile to White people as well as demeaning to Black people." (*Id*. ¶ 52.)

Even assuming the posters are political, Plaintiffs offer no authority supporting a "political speech" exception to the government speech doctrine. Such an exception would be absurd because it would discourage elected officials and government figures from taking positions on political issues—which is the very reason for their election and appointment. *See Walker*, 576 U.S. at 207 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says. . . . Were the Free Speech Clause interpreted otherwise, government would not work.") (citation omitted); *Pleasant Grove City*, 555 U.S. at 468 ("If every citizen were to have a right to insist that

14

no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed.") (citation omitted).

The contested "Black Lives Matter" posters bear the District logo, slogan, website link, and an explicit statement that the District stands by the message. When displayed in District schools' hallways and classrooms, the public would likely and reasonably perceive the posters to be a message from the District to its students, and not a message from unidentified political actors.[9]

### 3. The District shaped and controlled the posters

The final government speech factor considers the "extent to which the government has actively shaped or controlled the expression." *Shurtleff*, 142 S. Ct. at 1590. Plaintiffs' own allegations show how the District shaped and controlled the Inclusive Poster Series.

Plaintiffs allege that the District employed a review process that included participants from the schools, the school board, and the community. They identify three instances where the District considered altering poster content in response to feedback. The District's Director of Equity Services reported her intent to grant a request to include an Asian student on a poster. The District's Native American liaison requested that a poster include a child with braids to represent Native Americans. And the District's

---

[9] It is neither reasonable nor likely that the public would perceive the posters to be a reference to what Plaintiffs call a "neo-Marxist," "Black separatist, supremacist, and racist ideology" that "identifies Black Americans as part of the global Black family and seeks to disrupt the Western-prescribed nuclear family structure," especially when Plaintiffs' own attorney could not explain at oral argument what those phrases mean.

15

Public Relations Director indicated that the rainbow flag poster would include a boy instead of a girl. "The fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider." *Walker*, 576 U.S. at 217; *see also Summum*, 555 U.S. at 468 ("A government entity may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message."). Having a review process and considering stakeholder feedback and public comments (including Plaintiffs' request for alternative messages) is sensible and illustrates the District's role in shaping the posters' content.

In addition, Plaintiffs allege that the school board "authorized" and "allowed" hanging the posters, indicating that the District ultimately had the final say over whether posters could or could not be displayed. The Supreme Court has determined that exercising final approval authority indicates government control. *See Walker*, 576 U.S. at 213 (finding specialty license plates designed by third parties were government speech because the state entity exercised "final approval authority" by rejecting and requesting changes to designs); *Summum*, 555 U.S. at 473 (stating city "effectively controlled" donated monuments because the city had final approval authority over which monuments were to be displayed in a public park); *cf. Shurtleff*, 142 S. Ct. at 1592 (concluding city exercised no control over flag-raising requests because there was no documented review process and the "practice was to approve flag raisings, without exception"). Plaintiffs' allegations and the recorded school board meetings support finding that the posters were subject to the District's approval before being made available to teachers.

Plaintiffs' conclusory allegations that the District did not create the posters are of little consequence. Just as the Texas Department of Motor Vehicles did not design the applied-for specialty license plates in *Walker*, and Pleasant Grove City did not create the donated monuments in *Summum*, the District could have simply adopted the posters without alteration, and still the posters would be considered the District's speech.[10]

The Court is also not persuaded by Plaintiffs' argument that the District ceded control over the posters by allowing teachers to choose which posters, if any, to hang in their classrooms. *See Walker*, 576 U.S. at 212–13 (allowing drivers to choose which specialty license plates, if any at all, they wanted to display did not defeat finding that plates were government speech). Offering teachers their choice of which posters to display (or not display) does not change the fact that the District first shaped the posters' design, content, and message, and exercised final approval authority.

In sum, all three factors support finding that the Inclusive Poster Series, including the two contested "Black Lives Matter" posters, is government speech not subject to First Amendment challenge.[11] Accordingly, Plaintiffs' First Amendment claims are dismissed.

---

[10] Other federal courts have similarly reasoned that "Black Lives Matter" murals and art are government speech. *See, e.g.*, *Small Bus. in Transp. Coal. v. Bowser*, 610 F. Supp. 3d 149 (D.D.C. 2022); *Jud. Watch, Inc. v. Bowser*, 590 F. Supp. 3d 1 (D.D.C. 2022); *Penkoski v. Bowser*, 548 F. Supp. 3d 12 (D.D.C. 2021); *Women for Am. First v. de Blasio*, 520 F. Supp. 3d 532 (S.D.N.Y. 2021), *aff'd sub nom. Women for Am. First v. Adams*, No. 21-485-CV, 2022 WL 1714896 (2d Cir. May 27, 2022).

[11] Because the posters (and the messages they bear) are found to be government speech, Plaintiffs' argument that the District created a "de facto designated public form" is inapposite. *See Walker*, 576 U.S. at 215 ("Because the State is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply.").

17

## CONCLUSION

The Supreme Court instructs that "courts should not intervene in the resolution of conflicts which arise in the daily operation of school systems unless basic constitutional values are directly and sharply implicated in those conflicts." *Pico*, 457 U.S. at 866 (quotation omitted). School boards—comprised of elected officials who are held accountable through the ballot box—are tasked with creating an educational environment that prepares young minds to be contributing members of our diverse society. Whether the District accomplished its desired goals for the Inclusive Poster Series is a question to be answered by its residents. But whether the posters are government speech is a question to be answered by the courts, and in this case the Court answers in the affirmative. Plaintiffs' viewpoints were presented, considered, and not accepted by the District. Imposing by judicial fiat what the democratic process had considered and rejected would be improper.

## ORDER

**IT IS HEREBY ORDERED** that Plaintiffs' Motion to Proceed Pseudonymously (Doc. No. 30) is **DENIED**; Defendants' Motion to Dismiss (Doc. No. 23) is **GRANTED**; and Plaintiffs' Amended Complaint (Doc. No. 17) is **DISMISSED WITH PREJUDICE** in its entirety.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: August 21, 2023

*s/ Jerry W. Blackwell*
JERRY W. BLACKWELL
United States District Judge